IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHNSON WELDED PRODUCTS, INC.
625 South Edgewood Avenue
Urbana, Ohio 43078

LILLI JOHNSON
625 South Edgewood Avenue
Urbana, Ohio 43078

       Plaintiffs,

   v.

KATHLEEN SEBELIUS, in her official
capacity as Secretary, United States Department
of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201

TIMOTHY F. GEITHNER, in his official
capacity as Secretary, United States Department
of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220

HILDA L. SOLIS, in her official capacity as
Secretary, United States Department of Labor
200 Constitution Avenue, NW
Washington, D.C. 20210

UNITED STATES DEPARTMENT OF
LABOR
200 Constitution Avenue, NW
Washington, DC 20210

       Defendants.

**COMPLAINT**

Plaintiffs Johnson Welded Products, Inc. ("JWP") and Lilli Johnson (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This is a civil action in which Plaintiffs seek to protect and defend their fundamental rights protected by the United States Constitution and the Religious Freedom Restoration Act.  Plaintiffs are challenging certain implementing regulations of the Patient Protection and Affordable Care Act ("Affordable Care Act") that require them to provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling under penalty of federal law (hereinafter "contraceptive services mandate" or "mandate").

2.      Plaintiffs seek a preliminary and permanent injunction enjoining the challenged mandate and a declaration that the mandate violates federal constitutional and statutory law.  The mandate is unconstitutional on its face and as applied in that it, among other things, violates Plaintiffs' rights to the free exercise of religion and the freedom of speech under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

## JURISDICTION AND VENUE

3.      This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this court pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1346.

4.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 28 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this court.

5.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this district and a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district.

6.      This court has authority to award Plaintiffs their reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, 42 U.S.C. § 2000bb-1, and the general legal and equitable powers of this court

## PARTIES

7.      Plaintiff JWP is a closely-held, family owned and operated business that is located in Urbana, Ohio.  JWP manufactures reservoirs for air brake systems.  It has approximately 270 full-time employees.

8.      JWP is incorporated under the laws of the State of Ohio, and it has elected to be treated as an S-Corporation since 2000.

9.      As part of its corporate philosophy, JWP and its owners "subscribe to the Golden Rule," which they apply in "business as well as [their] personal lives."  The Golden Rule philosophy of JWP is a direct reflection of the Catholic religious beliefs and convictions of its owners, specifically including Plaintiff Johnson.

10.     The Golden Rule carries with it the command from Jesus to love one another as He has loved us.  And Jesus loved us first and foremost by doing the will of the Father. Consequently, the Golden Rule is a mandate to follow God's law, which the contraceptive services mandate violates.

11.     As part of its corporate philosophy, JWP and its owners "are continually aware that [their] success depends," in large measure, on their "freedom to exist as a private enterprise."  This freedom to exist as a private enterprise includes the freedom to operate JWP consistent with the Catholic religious beliefs and convictions of its owners, including Plaintiff Johnson.

12.     Plaintiff Lilli Johnson is an adult citizen of the United States, and she resides in Ohio.

13.     Plaintiff Lilli Johnson is a Catholic and the mother of seven children, all of whom she raised Catholic.  Plaintiff Johnson is the President and majority owner of JWP, holding a 50% ownership stake.  Each of Plaintiff Johnson's seven children owns an equally-divided, minority interest in the company.  There are no other owners of JWP.

14.     As the majority owner of JWP, Plaintiff Johnson establishes and approves the policies governing the conduct of all phases of JWP, and she makes the executive decisions governing the operations of JWP, specifically including decisions regarding the health care coverage provided by the company to its employees.

15.     As the majority owner of JWP, Plaintiff Johnson strives to run her company consistent with her sincerely-held Catholic beliefs.

16.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services (hereinafter "HHS").  In this capacity, she has responsibility for the operation and management of HHS, including the enforcement of the challenged mandate. Defendant Sebelius is sued in her official capacity only.

17.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

18.     Defendant Timothy Geithner is the Secretary of the United States Department of the Treasury.  In this capacity, he has responsibility for the operation and management of the Department of the Treasury, including the enforcement of the challenged mandate.  Defendant Geithner is sued in his official capacity only.

19.     Defendant Department of the Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

20.     Defendant Hilda Solis is the Secretary of the United States Department of Labor. In this capacity, she has responsibility for the operation and management of the Department of Labor, including the enforcement of the challenged mandate.  Defendant Solis is sued in her official capacity only.

21.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

## FACTUAL ALLEGATIONS

### The Affordable Care Act

22.     In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act (Pub. L. No. 111-148, 124 Stat. 119 (2010), *amended by* Healthcare and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010)) (hereinafter "Affordable Care Act" or "Act").

23.     Among many other things, the Affordable Care Act requires employers with more than fifty (50) employees to provide federal government-approved health insurance or pay a substantial per-employee fine.  26 U.S.C. § 4980H.

**The Affordable Care Act — Not a Neutral Law of General Applicability**

24.     To date, HHS has granted over 1,000 individualized waiver requests from employers and to insurance plans excusing their compliance with the Affordable Care Act.

25.     The fine for failure to offer an approved health insurance plan does not apply to employers with fewer than fifty (50) employees, not counting seasonal workers.  26 U.S.C. § 4980H.

26.     Certain provisions of the Act do not apply to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (providing that the individual mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); § 5000A(d)(2)(a)(ii) (providing that the individual mandate does not apply to members of a "health care sharing ministry" that meets certain criteria).  None of these exceptions apply to Plaintiffs.

27.     The Affordable Care Act's preventive care requirements (described below) do not apply to employers who provide so-called "grandfathered" health care plans.  The Affordable Care Act's default position is that an existing health care plan is not a grandfathered plan.

28.     The Affordable Care Act is not generally applicable because it does not apply equally to all individuals and employers; because the Act provides for numerous exemptions from its provisions, including exemptions for some religious groups and for some religious beliefs, but not for others; and because HHS grants individualized waiver requests excusing some employers from complying with the provisions of the Act.

29.     The Affordable Care is not neutral because some groups, both secular and religious, enjoy exemptions from certain provisions of the Act, which others do not; because some groups, both secular and religious, have received waivers from complying with the provisions of the Act, while others have not.

30.     Plaintiffs are not eligible for any exemptions from the Act, and they are not eligible for an exemption from the challenged mandate.

### The Affordable Care Act — Development of the Contraceptive Services Mandate

31.     The Affordable Care Act mandates that health insurers "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).

32.     On July 19, 2010, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations "implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services."  75 Fed. Reg. 41726 (July 19, 2010).  Among other things, the interim final regulations required health insurers to cover preventive care for women "as provided for in guidelines supported by the Health Resources and Services Administration."  75 Fed. Reg. 41759.

33.     HHS accepted public comments to the 2010 interim final regulations until September 17, 2010.  Upon information and belief, a large number of groups filed comments, warning of the potential conscience implications of requiring individuals, corporations, and other organizations to pay for certain kinds of services, including contraception, sterilization, and abortion, which includes abortifacients.

34.     HHS commissioned a study by a private health policy organization, the Institute of Medicine (hereinafter "IOM"), "to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women."  (*See* http://www.hrsa.gov/womensguidelines).

35.     In conducting its study, IOM invited the various pro-elective abortion groups and individuals to make presentations on the preventive care that should be provided by all health insurers, including the following: the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists, the National Women's Law Center, the National Women's Health Network, Planned Parenthood Federation of America, John Santelli, and Sara Rosenbaum.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

36.     No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

37.     On July 19, 2011, IOM published a report of its study regarding preventive care for women.  Among other things, IOM recommended that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures." (*See* Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (2011)).

38.     Federal Drug Administration-approved contraceptive methods include, among other drugs, devices and procedures, birth control pills, prescription contraceptive devices, Plan B (also known as the "morning after pill"), and ulipristal (also known as "ella" or the "week after pill").

39.     Plan B and ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the

implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an abortion.  Consequently, Plan B and ella are abortifacients.

40.     On August 1, 2011, HHS's Health Resources and Services Administration (hereinafter "HRSA") announced that it was supporting "the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines."  HRSA entitled the recommendations, "Women's Preventive Services: Required Health Plan Coverage Guidelines."  Among other things, HRSA's Guidelines include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  (*See* http://www.hrsa.gov/womensguidelines).

**The Affordable Care Act — Adoption of the Contraceptive Services Mandate**

41.     On August 3, 2011, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations which, among other things, mandate that all health insurers "provide benefits for and prohibit the imposition of cost-sharing: . . . . With respect to women, preventive care and screening provided for in comprehensive guidelines supported by HRSA . . . which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines."  76 Fed. Reg. 46621 (Aug. 3, 2011); 45 C.F.R. § 147.130.

42.     Defendant Departments "determined that an additional opportunity for public comment would be impractical and contrary to the public interest" and promulgated the final regulation without waiting for public comment.  76 Fed. Reg. 46624.

43.     The August 3, 2011, interim final regulations noted that "several commenters [to the July 19, 2010 interim final regulations] asserted that requiring group health plans sponsored

by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom."  Accordingly, "the Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. . . .  [T]he Departments are amending the interim final rules to provide HRSA additional *discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned."  76 Fed. Reg. 46623 (emphasis added).

44.     For purposes of the discretionary exemption set forth in the August 3, 2011, interim final regulations, a "religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii)."  76 Fed. Reg. 46623; 45 C.F.R. § 147.130.

45.     Although HHS accepted public comments to the 2011 interim final regulations until September 30, 2011, it went into effect immediately.

46.     Heath insurers are required to begin providing the coverage mandated by HRSA's Women's Preventive Care Guidelines (*i.e.*, the contraceptive services mandate) in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.

47.     Plaintiffs' plan year begins in July.  Consequently, the contraceptive services mandate will be operating in full force against Plaintiffs as of July 1, 2013.

48.     Thus, by the stroke of a bureaucrat's pen, the federal government purported to effect a rule forcing private health plans nationwide to cover sterilization and contraception, including drugs that may cause abortion.  All the other mandated "preventive services" prevent disease, but pregnancy is not a disease.

49.     The contraceptive services component of the preventive services mandate imposes a substantial burden of unprecedented reach and severity on the consciences of those who consider such "services" immoral: insurers forced to write policies including this coverage; employers, owners of businesses, and schools forced to provide, sponsor, and subsidize the coverage; and individual employees and students forced to pay premiums for the coverage.

50.     Upon information and belief, HHS received tens of thousands of comments objecting to the mandate regarding the provision of contraception, sterilization, and abortifacients.

51.     The United States Council of Catholic Bishops called for a rescission of the contraceptive services mandate, and, in the event HHS insisted on keeping the mandate, urged HHS to provide a conscience exemption for all of these stakeholders—not just the extremely small subset of "religious employers" that HHS proposed to exempt initially.

52.     On January 20, 2012, Defendant Sebelius announced that: "Nonprofit employers who, based on religious beliefs do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law." She further announced that: "We intend to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." (*See* http://www.hhs.gov/news/press/2012pres/01/20120120a.html).

53.     On February 10, 2012, President Obama announced that his Administration intended to propose and finalize a new regulation that "will require insurance companies to cover contraception if the non-exempted religious organization chooses not to. . . .   Contraception coverage will be offered to women by their employers' insurance companies directly, with no

role for religious employers who oppose contraception."   (*See* http://www.whitehouse.gov/the-press-office/2012/02/10/fact-sheet-women-s-preventive-services-and-religious-institutions).
This so-called "compromise" was rejected by the Catholic Bishops because it fails to protect religious freedom and the right to conscience.

54.     Defendants continue to reject considering a "broader exemption" from the mandate because they believe that such an exemption "would lead to more employees having to pay out of pocket for contraceptive services, *thus making it less likely that they would use contraceptives*, which would undermine the benefits [of requiring the coverage].  Employees that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives.  Including these employers within the scope of the exemption *would subject their employees to the religious views of the employer*, limiting access to contraceptives, *thereby inhibiting the use of contraceptive services* and the benefits of preventive care."  77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (emphasis added).  Thus, the ultimate goal of Defendants is to increase the "use of contraceptive services" and to ensure that employees are not "subject" to the employer's religious beliefs regarding such "contraceptive services."

55.     Defendants have thus made it clear that they do not intend to provide a "broader exemption" that would in any way "inhibit[] the use of contraceptive services" by employees or subject . . . employees to the religious views of the employer."   In short, Defendants do not intend to extend the exemption from the mandate to corporations such as JWP or their owners, such as Plaintiff Johnson.

56.     Pursuant to their vow to promulgate a new rule regarding the religious employer exemption and accommodation, in February 2013, Defendants released a notice of proposed rulemaking (NPRM) that would amend the contraceptive coverage requirement for certain *religious* employers and eligible *nonprofit* employers with religious objections to the contraceptive services mandate.  Specifically, the NPRM would, among other things, (1) "amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths"; and (2) "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage."  78 Fed. Reg. 8456, 8459 (Feb. 6, 2013).

57.     As proposed by the NPRM, organizations eligible for this accommodation are those that (1) oppose providing coverage for contraceptive services otherwise required to be covered, on account of religious objections; (2) are organized and operate as nonprofit entities; (3) hold themselves out as religious organizations; and (4) maintain self-certifications that criteria (1) through (3) are satisfied.  78 Fed. Reg. at 8474.

58.     Defendants intend to finalize the amendments to the regulations such that they are effective before the end of the expiration of a "temporary enforcement safe harbor," which will be in effect until the first plan year that begins on or after August 1, 2013.

59.     Under the temporary enforcement safe harbor, Defendants will not take any enforcement action against an employer, group health plan, or group health insurance issuer with respect to a non-exempt, non-grandfathered group health plan that fails to cover some or all

recommended contraceptive services and that is sponsored by an organization that meets certain criteria, including the requirement that the employer be organized and operated as a nonprofit entity, among others.  *See* HHS, "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers" (Aug. 15, 2012), available at http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Apr. 27, 2013).

60.    Plaintiffs do not qualify as a "religious employer" for purposes of the discretionary exemption, they are not eligible for the proposed "accommodation," and they are not eligible for the temporary enforcement safe harbor.  Consequently, the contraceptive services mandate will apply against Plaintiffs in full force on July 1, 2013.

### Plaintiffs' Sincerely Held Religious Beliefs Regarding Contraceptive Practices and Abortion

61.    Plaintiffs have a deep devotion to the Catholic faith.

62.    Plaintiffs hold and actively profess religious beliefs that include traditional Christian teaching on the nature and purpose of human sexuality.  In particular, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, Plaintiffs believe that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."  Plaintiffs believe and actively professes the Catholic Church teaching that "[t]o use this divine gift destroying, even if only partially, its meaning and purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."  Therefore, Plaintiffs believe and profess that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception and sterilization—is a grave sin.

63.     As Pope Paul VI prophetically proclaimed in *Humanae Vitae*, contraception has opened up a "wide and easy road . . . towards conjugal infidelity and the general lowering of morality."  Consequently, "growing used to the employment of anticonceptive practices," man is "los[ing] respect for the woman and, no longer caring for her physical and psychological equilibrium, [is coming] to the point of considering her as a mere instrument of selfish enjoyment, and no longer as his respected and beloved companion."  Consequently, the contraceptive services mandate is harmful to women.

64.     Plaintiffs also hold and actively profess religious beliefs that include traditional Christian teaching on the sanctity of life.  They believe and profess that each human being bears the image and likeness of God, and therefore all human life is sacred and precious from the moment of conception.  Consequently, Plaintiffs believe and profess that abortion ends a human life and is a grave sin.

65.     Further, Plaintiffs subscribe to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment.  For example, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

66.     Based on the teachings of the Catholic Church, and their own sincerely held beliefs, Plaintiffs do not believe that contraception, sterilization, abortion, or abortifacients are properly understood to constitute medicine, health care, or a means of providing for the well-being of persons.  Indeed, Plaintiffs believe these procedures involve gravely immoral practices.

67.     The contraceptive services mandate is, therefore, forcing Plaintiffs to choose between following their sincerely held religious beliefs or committing a grave sin.  If Plaintiffs

choose to follow their religious beliefs and convictions, then they will be subject to severe fines and penalties.

### Plaintiffs' Employee Health Insurance

68.     Plaintiffs employ approximately 270 employees.

69.     As part of its commitment to Catholic social teaching, Plaintiffs promote the health and well-being of their employees.  In furtherance of this commitment, Plaintiffs provide health insurance for their employees.

70.     When Plaintiffs renewed their health insurance policy in July 2012, they took affirmative steps to ensure that their policy did not include any offending coverage, such as the coverage required by the contraceptive services mandate.

71.     Plaintiffs endeavor to ensure that their insurance policies do not cover drugs, devices, services, or procedures inconsistent with their faith, including contraception, sterilization, and abortifacients.

72.     Plaintiffs object to providing health insurance covering artificial contraception, sterilization, or abortifacients, or related education and counseling because doing so violates their sincerely held religious beliefs.

73.     Plaintiffs object to providing information or guidance to their employees about other locations at which they can access artificial contraception, sterilization, or abortifacients, or related education and counseling because doing so violates their sincerely held religious beliefs.

74.     Plaintiffs' health care plan is not a grandfathered plan under the Affordable Care Act for multiple reasons, including, but not limited to, the following: (1) the health care plan does not include the required "disclosure of grandfather status" statement; (2) Plaintiffs do not take the position that their health care plan is a grandfathered plan; and (3) the health care plan

had an increase in a percentage cost-sharing requirement measured from March 23, 2010. *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

75.     Plaintiffs' health care plan is not a grandfathered plan because it has been materially changed since March 23, 2010.  During this time period, there was an increase in out-of-pocket costs (from $6,000 per family and $3,000 per individual to $10,000 per family and $5,000 per individual), a copay was added to its prescription drug coverage, the co-insurance coverage after deductible went from 100% to 90%, and the deductible increased (from $6,000 per family and $3,000 per individual to $7,000 per family and $3,500 per individual), among other changes.

76.     The contraceptive services mandate applies to Plaintiffs as they employ fifty (50) or more full-time employees and are not otherwise exempted from the mandate or eligible for the temporary enforcement safe harbor.

77.     The contraceptive services mandate went into effect on August 1, 2012, for non-exempt for-profit employers, such as Plaintiffs, and the mandate applies to the first health insurance plan-year starting after August 1, 2012.  Consequently, the mandate will apply against Plaintiffs in full force starting July 1, 2013.

78.     Plaintiffs wish to renew health insurance coverage for their full-time employees on July 1, 2013, while, at the same time, excluding coverage for all FDA-approved contraceptive methods, including injectable contraceptives, abortifacients, sterilization procedures, and related patient education and counseling, which are required by the mandate.

79.     Under the terms of the contraceptive services mandate and absent relief from this court, Plaintiffs will be required to violate their religious beliefs and moral values by providing

their full-time employees with coverage of goods, services, activities, and practices that Plaintiffs consider sinful and immoral.

80.     Failure to comply with the contraceptive services mandate will subject Plaintiffs to significant fines and penalties.

81.     Failure to provide health insurance that complies with the contraceptive services mandate may result in fines and penalties of $100 per day for each employee not properly covered, 26 U.S.C. § 4980D, as well as potential enforcement lawsuits, 26 U.S.C. §§ 1132, 1185d.

82.     Should Plaintiffs, pursuant to their sincerely-held religious beliefs and moral values, not provide health insurance that complies with the contraceptive services mandate for their approximately 270 full-time employees, they would be subjected to daily fines and penalties of about $27,000, totaling over $9.8 million annually.

83.     Non-exempt employers with fifty (50) or more full-time employees that fail to provide any employee health insurance plan are subjected to annual fines and penalties of $2,000 for each full-time employee, not counting thirty of them.  26 U.S.C. § 4980H.

84.     The contraceptive services mandate pressures Plaintiffs into choosing between complying with the mandate's requirements in violation of their sincerely-held religious beliefs and moral values or paying ruinous fines and penalties that would have a crippling impact on their ability to survive economically. The mandate, therefore, imposes a substantial burden on Plaintiffs' religious exercise.

85.     Any alleged interest Defendants have in forcing employers to provide their employees with FDA-approved contraceptives, abortifacients, sterilization procedures, and related education and counseling services, without cost sharing, is not compelling as applied to

Plaintiffs.  In addition, any such interest can be advanced by Defendants through other more narrowly tailored means that would not require Plaintiffs to pay for, provide access to, or otherwise support coverage of such items through their employee health care plan in violation of their religious beliefs and moral values.

86.     Plaintiffs lack an adequate or available administrative remedy.

87.     Plaintiffs lack an adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### (Free Exercise of Religion — Violation of the First Amendment)

88.     Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

89.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for contraception, sterilization, abortifacients, and related education and counseling violates Plaintiffs' right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution.

90.     Plaintiffs' sincerely held religious beliefs prohibit them from providing insurance coverage for contraception, sterilization, abortifacients, and related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

91.     Plaintiffs' sincerely held religious beliefs prohibit them from providing access to contraception, sterilization, abortifacients, and related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise

92.     The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling substantially burdens Plaintiffs' sincerely-held religious beliefs.

93.     The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling chills Plaintiffs' religious exercise.

94.     Plaintiffs must choose between being forced to purchase health insurance for their employees that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling or paying substantial penalty fines.

95.     The Affordable Care Act's requirement that employers provide health insurance that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling creates government-imposed coercive pressure on Plaintiffs to change or violate their sincerely-held religious beliefs.

96.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

97.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

98.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is a restriction on the free exercise of religion that is not narrowly tailored to advance any permissible governmental interest.

99. The Affordable Care Act's requirement that employers provide health insurance that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling does not accommodate Plaintiffs' sincerely-held religious beliefs.

100. The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not a neutral law of general applicability.

101. Notwithstanding its receipt of multiple objections to the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling on the basis that it would violate certain persons' sincerely-held religious beliefs, Defendants designed that requirement and its "religious employer" exemption in a way that makes it impossible for Plaintiffs to comply with their religious beliefs.

102. The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling is official action that targets religious conduct and beliefs for distinctive, discriminatory, and adverse treatment.

103. Defendants promulgated the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling in order to suppress Plaintiffs' and other similarly situated persons' right to free exercise of religion.

104.    The Affordable Care Act's violation of Plaintiffs' right to the free exercise of religion has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

105.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

## SECOND CLAIM FOR RELIEF

### (Violation of the Religious Freedom Restoration Act)

106.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

107.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, *et. seq.*).

108.    Plaintiffs' sincerely held religious beliefs prohibit them from providing insurance coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

109.    The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines substantially burdens Plaintiffs' sincerely-held religious beliefs.

110.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related

education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

111.   The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

112.   The Affordable Care Act's violation of the Religious Freedom Restoration Act has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

113.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

**THIRD CLAIM FOR RELIEF**

**(Freedom of Speech — Violation of the First Amendment)**

114.   Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

115.   The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling violates Plaintiffs' right to freedom of speech guaranteed by the First Amendment to the United States Constitution.

116.   The HRSA Women's Preventive Services: Required Health Plan Coverage Guidelines mandate that non-exempt employer-sponsored health plans cover "preventive services," which include "Contraceptive methods and counseling: All Food and Drug Administration approved contraceptive methods; sterilization procedures, and patient education and counseling for all women with reproductive capacity."

117.    The Affordable Care Act's contraceptive services mandate compels Plaintiffs to subsidize education and counseling regarding contraceptive methods, sterilization procedures, and abortifacients.

118.    The Affordable Care Act's contraceptive services mandate compels Plaintiffs to provide education and counseling regarding contraceptive methods, sterilization procedures, and abortifacients in violation of their sincerely-held religious beliefs.

119.    The Affordable Care Act's contraceptive services mandate compels Plaintiffs to engage in speech that violates their sincerely-held religious beliefs.

120.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for contraception, sterilization, abortifacients, and related education and counseling is not narrowly tailored to advance a compelling governmental interest.

121.    Defendants promulgated the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling in order to suppress Plaintiffs' and other similarly situated persons' right to freedom of speech.

122.    The Affordable Care Act's violation of Plaintiffs' right to freedom of speech has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

123.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act)

124.    Plaintiffs hereby incorporate by reference all stated paragraphs as though fully set forth herein.

125.    Because the Affordable Care Act itself does not specify a standard for judicial review, it is subject to review under the default standard of the Administrative Procedure Act.  5 U.S.C. § 706(2).  At issue in this lawsuit is whether adoption of the Act's requirement that employers provide insurance plans that include coverage for contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines (*i.e.*, contraceptive services mandate) was  "without observance of procedure required by law" and/or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

126.    The Administrative Procedure Act requires general notice of a proposed rulemaking and an opportunity for public comment before promulgation of a rulemaking, unless the agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.  5 U.S.C. § 551, *et seq*.

127.    Defendant Departments purported to find good cause to forego public comment on the August 3, 2011, interim final regulations on the Affordable Care Act's contraceptive services mandate on the basis that the public had the opportunity to comment on the previous interim final rule issued on July 19, 2010.  76 Fed. Reg. 46621 (Aug. 3, 2011).

128.    The July 19, 2010, interim final rule, however, did not include HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines, which mandated the coverage for contraception, sterilization, abortifacients, and related education and counseling. Accordingly, the public was deprived of the opportunity to comment on the contraceptive services mandate in the preventive services provision of the Affordable Care Act.

129.    Because Defendant Departments took agency action "not in observance of procedure required by law," Plaintiffs are entitled to relief under 5 U.S.C. § 706(2)(D).

130.    Similarly, Defendant Departments' decision to adopt the August 3, 2011, interim final regulations was made without considering the public's comments on the specific preventive procedures mandated therein, including coverage for contraception, sterilization, abortifacients, and related education and counseling.  Therefore, its action was "arbitrary, capricious, [and] an abuse of discretion."  Plaintiffs are therefore also entitled to relief under 5 U.S.C. § 706(2)(A).

131.    Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"—(*i.e.*, Title I of the Act, which includes the provision dealing with "preventive services")—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

132.    Further, the Weldon Amendment to the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009 prevents federal, state, and local governments from receiving certain federal funds if they discriminate against health care providers, including health insurance plans, that refuse to provide, pay for, provide coverage of, or refer for abortions.  Pub. L. 110 329, Div. A, Section 101 (Sept. 30, 2008) 122 Stat. 3574, 3575.   This "conscience clause" is designed to prevent discrimination against health care providers who have a moral objection to abortion.

133.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for contraception, sterilization, abortifacients, and related education and counseling includes "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures."

134.    Federal Drug Administration-approved contraceptive methods include, among other drugs, devices and procedures, birth control pills, prescription contraceptive devices, Plan

B (also known as the "morning after pill"), and ulipristal (also known as "ella" or the "week after pill").

135.    Plan B and ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law.  Consequently, Plan B and ella cause abortions.

136.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraceptives that cause abortions violates Section 1303(b)(1)(A) of the Affordable Care Act and the Weldon Amendment.

137.    As set forth above, the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates the free exercise of religion and the free speech guarantees of the First Amendment and the Religious Freedom Restoration Act.

138.    Because the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, sterilization, abortifacients, and related education and counseling or pay substantial penalty fines is "contrary to existing law," Plaintiffs are further entitled to relief under 5 U.S.C. § 706(2)(A).

139.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional and statutory rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.     That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates the First Amendment to the United States Constitution;

B.     That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines violates the Religious Freedom Restoration Act;

C.     That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines was issued in violation of the Administrative Procedure Act;

D.     That this court issue an order preliminarily and permanently prohibiting Defendants from enforcing the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling or incur substantial penalty fines against Plaintiffs, their group health plans, or the group health insurance coverage provided in connection with such plans;

E.     That this court award Plaintiffs their reasonable costs, including attorneys' fees, pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, 42 U.S.C. § 2000bb-1, and the general legal and equitable powers of this court;

F.     That this court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ Robert J. Muise
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ David Yerushalmi
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*